While Council are approaching, the Court will note for the record that we received two days ago a motion from Council for Ms. Reese asking to continue oral argument. This was about a week after the panel had been disclosed and the basis for the continuance, you all can come in and sit down. The basis for the continuance was Council's statement that he was involved in a criminal trial in District Court in the Central District of California. We denied the motion, but I will state for the record that that Council may well hear from the Court. It's nearly inconceivable that he did not know months ago that a major criminal trial like that was scheduled and that he didn't advise that Court or this Court promptly of the conflict between the two scheduled items, but we'll deal with that separately. Okay, so we have here Council for the SEC and Council for Ferris, is that correct? Okay. Mr. Schoenfeld? Come on, step up so it's on the record and we can hear you. And I informed the clerk and also opposing Council is aware that the opening brief in this matter as well as the reply brief were filed under seal with permission from this Court. The answering brief was filed in two parts, a sealed portion as well as an unsealed portion. The excerpts of record for the appellant, all except volume 5, were filed without being placed under seal. Volume 5 is under seal, so we bring it to the Court's attention that portions of the argument in this matter refer to an under seal portion and I leave it to the Court to guide us how that should be addressed. Thank you for your time, Your Honor. May I address the sealed portions in the oral argument? Sure. Thank you, Your Honor. I am ready, thank you. And if I can reserve five minutes for rebuttal, I'd appreciate it. May it please the Honorable Court... Do you want to put ten minutes on the clock, please? Thank you. We just find it easier if we put ten on, then you know when you're out of time and you're invading your rebuttal time. Thank you. Right ahead. May it please the Honorable Court, Richard Schoenfeld appearing on behalf of Connie Ferris appeals the granting of a motion for summary judgment by the District Court in favor of the Securities Exchange Commission and against Connie Ferris. The standard of review is de novo and that's under Christian Gospel Church versus City of San Francisco. Another significant aspect of law in this case is that the Court is not to weigh credibility. If there's conflicting evidence, that means it's an issue for a jury to decide and we find that in Baliant versus Carson City. Finally, as the Court's aware, the facts are to be construed in the light most favorable to the non-moving party, in this case, appellant. With that, I plan on addressing three issues in this case. The first issue is that there were, in fact, material issues of fact in dispute. The second issue is the failure of Judge Dawson to recuse himself and a sub-issue related to that is the failure of Judge Dawson to rule on a motion related to the compelling of two witnesses to be deposed. And the final issue I'll address is the penalty that was imposed by the District Court. The first issue, in the instant case, the District Court found that Ms. Ferris, the appellant in this matter, was responsible for the day-to-day activities of the fund, which was one of the Global Express entities. What the court ignored was the testimony of Elliot Lutzker and Aaron Mills. Elliot Lutzker was a Securities Exchange Commission attorney that was hired by the fund to represent the fund. And he testified that he was responsible for preparing the financial disclosures in this case. The non-financial portions were completely done by his office, whereas the financial portions of the disclosure were done with him in conjunction with Lou Anne Kicker. I take it he was a former SEC lawyer. When I say SEC lawyer, I meant that he specializes or his area of practice was securities law. Did he ever work for the commission? I don't know the answer to that, Your Honor. I apologize. So he's a securities lawyer. He's a securities lawyer out of New York, and he testified that he was hired as a result of his experience in securities law. So if we look at the fund, the president of the fund was Don Reese. That's obviously not Connie Ferris. The fund also had a chief financial officer, Lou Anne Kicker. The fund had an auditor, outside auditor, James Bonzo. The fund had an accountant, Jason Griffith. The fund had a compliance officer, Don Arnett. And the top of the totem pole for compliance aspects, so to speak, is Elliot Lutzker, the lawyer who's responsible for securities matters. But your client signed the forms. My client signed the financial disclosures after it went through those entire chains of command. So for the court, Elliot Lutzker testified that he rarely spoke to Connie Ferris. He almost entirely spoke with Lou Anne Kicker. James Bonzo testified that he dealt with Lou Anne Kicker. Ms. Ferris relied upon these people. That's what the evidence in this case showed. For the court to suggest that there wasn't a dispute in evidence and to find that Connie Ferris was responsible for the day-to-day operations of the fund when there was testimony completely contradictory to that. What makes it has to be responsible for day-to-day operations to be liable? Well, there's two sections here. If you look at the 10B claims, there is a requirement of Cianter. And I was going to address this when I got to penalty, but I'm happy to address it now. For Cianter, it should be plain at this point, the argument I've heard so far basically says we've got a bunch of other people involved. It doesn't say that there weren't misrepresentations and material omissions. And the problem is since your client appears to be the real party in interest in financial terms and the head of this pyramid, the fact that you hire a lot of other people doesn't say that she doesn't know what's going on. If what's going on is wrong and your client is the real party in interest financially and did sign the documents, the fact that she got a lot of other people involved to help her do that isn't a defense. Well, she did sign the document, but what we have to establish is that she intended to make a material misrepresentation, that she had knowledge that a material misrepresentation was being made in the disclosures. And there's two subsets to the misrepresentations. One is the prospectus and both the court and the SEC claims that there were rollovers made into this fund of non-performing loans. Well, there were. And there's no doubt about it. There were rollovers, but they take the position that the prospectus did not permit rollovers of non-performing assets. Well, where did it permit it? The testimony of Elliot Lutsker was clear that prior to the fund accepting rollovers, the prospectus was amended to permit it. And if we look at the prospectus that was dated October of 2003. Did anybody invest prior to that date? According to Mr. Lutsker, prior to anybody rolling their non-performing cash investors. Prior to that. Prior to cash investors prior to that date. I don't know the answer to that. My understanding. That make a difference because if you're told there won't be any rollovers, you take cash and then there are rollovers. Here is my understanding addressing that. It's my recollection that a portion of Mr. Lutsker's testimony referred to the prospectus. When it was amended, it advised the previous investors to inform the fund if they had any dispute with the amendments. And nobody notified the fund that there were any disputes. That was in the record from Mr. Lutsker's testimony as well as the prospectus'. So when it was amended to permit the rolling over of non-performing assets, the amended prospectus was sent to the customers and they had the ability to notify the fund that they opposed that. Nobody opposed the amendment to the prospectus. Does that make the? I think I have the same question you do. Does that make the earlier representation accurate? Which representation? Well, the one that was made before, before the prospectus was amended to permit this. And I might say, I read the material, the prospectus was amended to permit this. That's a far cry from telling somebody you just invested in a pot that has a whole lot of non-performing assets, which you can't be very optimistic is going to produce this substantial return in the future. So even if legally it's permissible under the amended prospectus, I'm not sure that addresses the misrepresentation problem. I don't believe that there was any evidence in the record to suggest that there was investment into the fund prior to the amended prospectus. And after the amended prospectus, 98% of the funds that were rolled over were non-performed. Correct. And that was permitted under the prospectus. And there were cash investors after the prospectus had been amended. Although the prospectus was. Now, if you were to say in your amended perspective, we expect that almost 100% of the funds that are being rolled over will be non-performing. Do you think that would have been a little more accurate statement? I don't know that they. Instead of permitting, but in fact, we're going to encourage and we're going to go out and get almost all the loans that are non-performing. I don't know that that was the intent of the fund at the time that the prospectus was issued. I know that evidence cited by the Securities Exchange Commission suggests that the large majority of the assets that were placed into the fund were non-performing. But there's nothing in the record to suggest that that was the intent at the time that the fund prospectus was amended. Wouldn't that make a difference? I mean, you go to Wall Street today and find out what happened to mortgage-backed securities and it turns out it makes a difference whether the debt is performing or not. And I take it there's nothing in the prospectus which arguably permitted after a certain date permitted rollovers of that kind. There's nothing that said this is actually what it's going to be. No, there's nothing to say that we are going to accept 98% of our fund is going to consist of non-performing assets. So the reality didn't turn out to be what the prospectus suggested it would be. The prospectus permitted the fund to accept non-performing assets and that's what the fund ended up doing. And if we look at the testimony of Sue Eckhardt who was the compliance officer for the state of Nevada when they did their audit, she also acknowledged that the fund prospectus permitted the rolling over of non-performing assets. Were investors ever told at any point along the way what the percentage of non-performing assets were? I don't believe so. And at what point did it reach 98%? I don't know the answer to that either. Was it right away? No, it wasn't right because as the SEC has stated there were cash investors as well as the rolling over into the fund so it wouldn't have been at the outset. In any of the sales presentations were potential investors told about this? It's my understanding from the deposition of Mr. Mills that investors were informed that the rolling over of non-performing assets would occur. And that the fund consisted of a very high, almost complete non-performing assets? That's a conclusion that the SEC reached after they had received their injunction. So there wasn't anything in the record to suggest that within, you know, the first 50% of operation time there wasn't a ratio analysis done. This was a conclusion that was reached after the commencement of litigation. They determined that 98% of the fund consisted of the non-performing assets. If I may address the second issue which was the failure for Judge Dawson to recuse himself. In August of 2004 it was brought to the attention of the district court that Veston Mortgage may have had a role in this case. And what Judge, may have had a role I apologize. And I'd like you to focus on exactly what these witnesses had to say to this case because I haven't found it yet. Okay, here's what happened. Initially it was brought to the court's attention that the court should address that the court's brother John Dawson had a relationship with Veston. At that time the court disclosed that his brother was, I quote, I believe he said apparently, on the board. And he stated that unless there was a more direct link to Veston, there would be no need to recuse himself. Thereafter we scheduled two depositions, one of Lance, there was a gentleman Byrne and a gentleman Bradford, both Veston employees. They filed a motion for a protective order in the magistrate court. We filed an objection. The magistrate judge ruled that the depositions would be relevant. And the relevance to the deposition is under the Doe v. Cutter case. We were trying to demonstrate an industry standard that Global Express was being singled out as it related to allegations of providing perceived or potential interest returns. And we said in our briefs that the perspective states there's no guarantee on returns. In any event, they filed an objection. Let me stop you here because I still don't really understand what these other witnesses working for other companies, I take it there's no allegation they had anything to do with Global's operation or the representations made by Global. That's correct. It was. What difference does it make if there's an industry standard that permits what under securities laws, securities fraud? Because it's a defense to the 17 B and C causes of action which are as the Securities Exchange Commission represents to this court a negligence standard. It's also a defense to the aiding and abetting which requires a knowing violation of the laws. And the magistrate judge agreed that they were relevant depositions. They refused to attend the depositions. We filed a motion to compel, an emergency motion to compel. It was never addressed. We then filed a motion to recuse Judge Dawson. Again, in that motion addressed the fact that these two pending depositions haven't been ruled upon and that was one of the basis for the perceived bias. And I'm not suggesting or I'm not stating that it has to be an actual bias. Under 28 U.S.C. 455, it has to be a perceived bias or a potential bias. We know the fact. By which way? I don't understand what your bias claim is. Because there were. I mean, I understand that they were family members. But how would it have affected him vis-a-vis to be biased against your client? Because he failed to rule on the motion to compel the two depositions, which is something that we wanted to use in discovery. So bias has nothing to do with the end result. Bias has something to do with what would happen. Let's assume that they testified in court. What difference would that make? Well, I guess the perceived bias here is that he didn't rule on the motion to compel as a result of his relationship with Veston, knowing that these two Veston employees did not want to participate.  His brother was on the board of directors and his sister-in-law was the treasurer, is what we presented to the court. Okay. You're into your rebuttal time a little bit. Thank you. Thank you for your argument. We'll hear from the commission at this time. May it please the court, my name is Alan Caputi for the United States Securities and Exchange Commission. For honors, I'm going to open up by doing something that an appellate lawyer is always told in law school not to do. I apologize to any law students who are here, but I have to open up by admitting that I made a misstatement in my brief. We said in our brief that the amendment, that the prospectus was not amended until July 2003 to allow them to accept into the fund defaulted loans. In fact, if you look at the testimony of Mr. Lutzker, it's not clear whether he's talking about 2002 or 2003. And it's consistent, in fact, with the amendment being made in 2003, July of 2003. Over the weekend, though, I did go through all the amendments that were made to this prospectus, there are about 30 of them. A lot of them are to the financial statements, but there are nine, I believe, substantive amendments. And one of them, which was made in 2002, does allow the prospectus to accept defaulted loans. The problem as the court, I think, from what I've just heard, understands that under the circumstances of this case, it is deceptive not to, it is a deceptive omission of material fact not to actually state in the prospectus that in fact there are defaulted loans being accepted into the fund. They were not saying that this was an investment vehicle that was not going to be earning money for a period of time. They said in their periodic reports, filed with the Commission of 10 Qs, that this was a fund that was making a lot of money. They said that they were, they paid investors $2.8 million. So your brief said what date? July 2003. And the actual date is? I believe August 30, 2002, I believe, Your Honor. But again, under the circumstances of this case, where you are telling people there are enormous amounts of profits being made, where you were telling people those profits come from, the returns on these, on these, on these trustee notes, and where you were actually paying investors 12% per month. And under those circumstances, it is a material omission and it's deceptive practice not to affirmatively state in your periodic reports and in your prospectus that in fact you are accepting a large volume. Under this, under this case, not merely that you're accepting loans, but you're accepting a large volume of defaulted loans. It is not enough to really say you may accept them. There have been a lot of- Does the district court rely at all upon cash investments made prior to, between the period, between August of 2002 and July of 2003? Your Honor, the cash investments, there are, yes, I believe, I believe it did. The cash investments- That's not my question. Let me make clear what I'm asking so you understand. I'm clear on the question and you understand it's important. Is it possible that the district court assumed as a matter of material and undisputed fact that there were cash investments in the fund made prior to any disclosure in the prospectus about non-performing loans being part of the assets? I really don't know that. The, I think the district court was aware that there were 20 to 25 loans that the fund purchased. I mean, we're here on summary judgment and the underlying superstructure of summary judgment, of course, is undisputed material facts. Yes. And my question is, now that you've corrected, we appreciate your doing that, but now that we've made that correction, is it possible the district court, based upon your earlier representations to the district court, which apparently were that there was no amendment until July of 2003- No. Yes. I assume that the judge- The district court relied upon that as- The judge did believe, I believe, from reading his opinion that, and it's, the amendment I don't believe is on the record. It's not on the record and you can't tell from Mr. Lutzker's testimony, which is the testimony that is cited. To this court, a page is cited that doesn't appear in the record anywhere. It doesn't appear in the excerpts of the record. So I assume the judge did rely on what the commission had stated. Well, he made a factual finding that the amendment occurred in July of 2003. I'll read it to you. The disclosure prohibited the fund from investing in or purchasing, accepting, was taken out in the July 2003 prospectus. That is correct, Your Honor. But, Your Honor, I would say the judge goes right after that, the judge goes on to say, in paragraphs 29 and 30, he goes on to say that, in this case, it was a material omission not to disclose to investors that, in fact. Right, but he relies then on the November 2003 statements. So it doesn't, I guess what I'm driving at, the district court may not have gotten to the point that your opponent has raised that, or claims that there were no non-performing investments that were taken in post pre-amendment, if I'm making myself clear. There were non-performing loans taken in largely in March of 2003. You're talking about what went into the fund. We're talking about cash investments by outside investors who were reading the prospectus between August of 2002 and July of 2003. Right, cash investors who were reading, right, cash investors and rollover investors. Those notes were in default, and most of, just Ferris admits that 98% of them were in default. Rees admits that over half of them had been foreclosed on by the time the deposition for investigatory testimony was taken in November of 2003, while the fraud was still going on. So these are not, this is not deposition, this is not testimony that's being taken a year after the fact. Right, but do we have any evidence in the record that non-performing loans were rolled in prior to the amendment? Yes, prior to the amendment. Yes. Yes, there were non-performing loans. And where would we find that? You would find that in the testimony of Rees and the testimony of Ferris. How about cash? Was there evidence that cash was put in? Yeah, there's a lot of record. I haven't identified when it was that money actually started to go into the fund. Well, Your Honor, the fraud was going on while Ms. Ferris was, while she gave her testimony, and at that point she admits that all of the cash investments, all the loans that were purchased for cash actually were in default. What I'm thinking is the investors, when did money start to come into this fund? It started to come in, and rollovers started in early of 2000, early of 2002. Prior to that time, were there any cash investments, or were the rollovers the first ones? I don't know, I'm not exactly sure. So you don't, the record is unclear as to when the first cash investments occurred? Is that what you're saying? I'm not aware of that, Your Honor, of when the first cash investments were made. Isn't that important? Your Honor, I don't believe so, because I think it's kind of a non-issue actually, because it had to be disclosed to people that they were accepting default loans, and there was no affirmative disclosure here. I take your point, but if nobody's investing, then it's sort of... Well, there were 20... Nobody's relying on the misinformation. The steam kind of comes out of your case. Certainly there were people who were relying on the misinformation, which being each individual investor who rolled a defaulted loan over into the fund knew about their individual defaulted loan. They didn't know about the other 599. So there were 600 rollover investors. But if one assumes, one assumes that on this, construing the facts in the light most favorable to Ms. Ferris, if all of the non-performing loans came in after the amendment, then there arguably was a disclosure that these were permitted. And of course, the people who were rolling in the loans knew about their own loans. Now, you can argue about different misrepresentations, but I'm just focusing on that one so that I have it clearly in my mind. There were a number of cash investors. I believe that Ferris argued... Ferris says in her testimony that the cash investors... There were cash investors being rolled over in April of 2003, but I'm not certain of that. But again, I come back to the undisputed testimony of Rees and of Ferris in this case, that they knew that these notes were largely non-performing, that they were in default. And both of them testify that not only were they in default, but that they knew... Rees even says this in her brief, they knew that the money was being paid to investors actually was from so-called contributions to the fund. So there are a number of misrepresentations made here. The main misrepresentation here is that the investors were told that the money was coming from income from these loans. In fact, the money was coming from so-called contributions. That's where... What's the best evidence that Rees knew that? Rees' own brief. Rees in her brief admits that she knows that money... That Ferris is taking these contributions, these so-called contributions, and paying the investors with the contributions. And of course, Ferris admits that she was actually doing that also. I would say, in addition, as to the defense in this case, which is that they relied on others, if you look at the testimony, the undisputed facts, the testimony of Rees and Ferris in this case, you will see that they were the people in the best position to know that this was nothing more than a basket of non-performing loans. The problems that I have with this record is that district court does not cite to those things. You read the conclusions, for example, about Rees, and there's no citation to specific points in the record and the deposition and that sort of thing. And that leaves us with the task of trying to dig it out. Well, as Therese, if you read her testimony, she knew and she's testifying... Now, ordinarily, when we get something from a district court, it will say, I found that Rees knew or should have known based on these facts. One, and then a citation to a part of the record where we can turn to it to see if it supports the proposition that's being made. I know you're not responsible necessarily for what the district court writes, but it makes it more difficult in this case. Let me turn to a factual question I have. There was $24 million came into the fund? Is that the right figure? In that range, yes. I think it was maybe $22. Was any portion of that ever distributed to investors? Yes. How much? I believe about $513,000. Was there any credit given Ferris and Rees in the disgorgement for that, the amount that went out? What we did in disgorgement... Can I start with a yes or no? No, there was no credit. What we did with the disgorgement figure is a very conservative figure. $48 million came into the fund. Before you tell me that it's a wonderful figure and defensible and all of that, the step one is there was money that went out to investors and neither Rees nor Ferris received any credit for it. No, Your Honor. The court just assumed that the entire $24 million was their responsibility to disgorge. The commission made a reasonable assessment of what the disgorgement should be based on the amount of money that was received... And the district court accepted that? Yes. Reasonable estimation? Yes. Accepted that reasonable estimation. The disgorgement was in the amount of $23.2 million? Yes. Yes, sir. There was nothing taken into consideration for what was paid out for legitimate administrative and staff and other expenses considered? Your Honor... Yes or no? No, Your Honor. But the operating expenses here were supposed to be handled by the fund manager. Under the terms of the disgorgement, are Ferris and Rees entitled to any credit for monies that come in? No, Your Honor. Your Honor, $48 million came in, but a lot of that money had to do with the initial face value of the notes. So what we did, what the commission did, was it just looked at the amount of money... Rather than assessing a disgorgement out of $48 million, we looked at just the amount of money that came into Ferris' holding company's bank account and also into the bank account of the fund itself. And that was money which they both had the benefit of because that money was used to keep the fund going. Is it the commission's position that under the terms of the disgorgement order only Ferris and Rees are responsible to pay and they receive no credit for any monies that come in from other sources? Start with the first. Are they the only two that are obligated to pay? Yes, Your Honor. And do they get any credit for any monies that come in from any other source? No, Your Honor. I think the court explained what the commission did and we basically said that the fairest way to go about assessing disgorgement was to look at the amount of money that came into the fund and the amount of money that came into the bank account of the holding company. Okay. Thank you. Thank you for your argument. We have a few minutes for rebuttal. I wanted to address damages. If we take the position that 98% of the fund was non-performing assets at the outset or at the conclusion when litigation commenced, then how is it that we get a disgorgement figure of $24 million? If you're assuming that these assets were placed into the fund and they were already non-performing and you take the position such as the SEC has that in essence there's little value to those non-performing assets. Well, they're non-performing, but the assets themselves have intrinsic value. Exactly. And that's the point that I was going to make. No credit was given to Ms. Farris in this case for those assets. There's a receivership estate. There's been a receivership for years. They sell assets. There's corporate buildings. There's land. Money's coming back in. So there was a value to the fund. There was an intrinsic value. There still is a value. And Ms. Farris was given no credit for that when the disgorgement was entered. And that's the point I wanted to make. Going back to there being disputed facts, there's nothing in the record, and SEC counsel couldn't point to anything in the record to suggest that the fund accepted cash investments or rollovers prior to the 2002 amendment to the prospectus which permitted the rollover of non-performing assets. They've acknowledged that as early as August 2002 the fund did permit rollovers. That's consistent with Mr. Lutzker's testimony which was presented to the district court that said it was as early as 2002, may have gone into 2003 when the prospectus was amended to allow rollovers. Mr. Lutzker also specifically testified that was the fund permitted to accept non-performing assets? The answer was yes at page 158 of his testimony, page 391 of the excerpts. And then the next question was do you believe that it is clearly outlined in the prospectus? Answer, I believe that there was proper disclosure made in the prospectus. So this is the counsel that was hired by the fund to advise them under securities laws. And he testified that the fund did make proper disclosures related to rollovers of non-performing assets. It's a disputed fact. That means you can't have summary judgment. It was presented to the district court. There was also testimony from Aaron Mills presented to the district court. There were disputed facts. The court was not to weigh credibility and in the order of the court it ignored the testimony. One thing that's not disputed is that your clients started paying substantial sums of money into the fund that were used for distributions and that there was no disclosure of that fact, correct? That's correct but there was testimony and this goes to the scienter factor. There was testimony that it was disclosed internally within Global Express and then Lou Anne Kicker and James Bonzo communicate and then it goes to Elliot Lutzker. So what was not an undisputed fact is Ms. Ferris' knowledge that it didn't go up the totem pole so to speak and make it into the disclosures. She relied upon these people. There was testimony to that. She's not an accountant. She signed the disclosures. The disclosures don't have the fact that she was putting in far in excess of her salary into the corporation or the fund. And that was one of the two sources of payment to the guaranteeing the interest. Why isn't that enough to show recklessness? Because of the compliance officers the auditors, the accountants and all the people that Ms. Ferris relied upon and the testimony from Mr. Mills that there was knowledge within the office that capital contributions were being made. So that was to be communicated to Mr. Bonzo and Mr. Lutzker and incorporated in the disclosures and Ms. Ferris relied upon those people. That's why the fund had all these people compliance officers, outside auditors, accountants CFO, Lou Anne Kicker, President Don Rees I don't believe that based on the record in this case it was fair to conclude that Ms. Ferris acted with Scienter and if it's in an aiding and abetting capacity because she's not the President then there actually has to be knowledge as well. So it takes the 17 B and C and puts into that more than a negligent standard. There has to be knowledge. So there has to be intent if it's as an aid or an abetter which is clearly what it was in this case because she wasn't the President of the Fund. Thank you. Thank you both for your arguments. Interesting case. It's submitted for decision and the Court will stand adjourned.
judges: Hawkins, Thomas, Clifton